Ex parte ESMERALDA SAINZ, Petitioner

No. 1

District Court of the Virgin Islands

St. Thomas and St. John Sub-Judicial District
St. Croix

August 22, 1928

WILLIAMS, *Judge* .

The petitioner, Esmeralda Sainz, on the 6th day of August, 1928, filed her petition, in this court, praying that she be admitted to the Bar of this jurisdiction, alleging, amongst other things, that —

> "(1) I am a citizen of the United States of America, and of legal age;
>
> "(2) That I am of good moral character;
>
> "(3) That I have the requisite learning and ability to practice as a lawyer;"

and deposited therewith Francs 50.00 as admission fee. She seeks admission to the Bar under the provisions of an ordinance (Colonial Council of St. Thomas and St. John) entitled "An ordinance to better provide for the appointment of attorneys, their admission to practice, their duties and authority, and for other purposes," approved March 13th, 1919 (4 V.I.C. § 441 note), the applicable parts thereof being as follows:

"Section 4. That an applicant for admission as attorney must apply to a court of general jurisdiction, and must by petition show:

"First: That he is a citizen of the United States or was a Danish citizen or subject residing in the Virgin Islands on January 17, 1917, who continued to so reside in said Islands for one year thereafter without declaring before a court of record an intention of retaining the status of a Danish citizen or subject as provided for in Article 6 of the convention ceding the Virgin Islands to the United States [1917; 39 Stat. 1706; prec. 1 V.I.C.], and of the age of 21 years.

158

"Second: That he is a person of good moral character, which may be proved by any evidence satisfactory to the court.

"Third: That he has the requisite learning and ability, which must be shown by the examination of the applicant by a board of three examiners composed of the Judge of the District Court and two other persons, one appointed by the Government and the other by the Colonial Council for a term of one year.

"Section 5. That hereafter women shall be admitted to practice law as attorneys in the Courts of St. Thomas and St. John upon the same terms and conditions as men.

"Section 6. That if, upon the examination the applicant be found qualified, the Court shall administer an oath to the applicant to support the Constitution and laws of the United States and of the Virgin Islands of the United States and to faithfully and honestly demean himself or herself in office. The Court shall then direct an order to be entered to the effect that the applicant is a citizen of the United States, or was a Danish citizen or subject residing in the Virgin Islands on January 17, 1917, who continued to so reside in said islands for one year thereafter without declaring before a court of record an intention of retaining the status of a Danish citizen or subject as provided for in Article 6 of the convention ceding the Virgin Islands to the United States [supra], and of the age of twenty-one years, of good moral character, and possessed of the requisite learning and ability to practise as an attorney in all the Courts of St. Thomas and St. John, and has taken the oath of office; and upon entry of the order and payment of the legal fee, he or she shall be entitled to practise as such attorney, and not otherwise. The legal fee referred to in this paragraph shall be 50 francs, which shall accompany the petition for admission, and thereafter, on the first of January each year, each attorney of the District shall pay 50 francs to the Clerk of the Court to continue his permit in force."

It is to be observed that that ordinance respected the rights reserved to Danish citizens under Article 6 of the treaty of cession between the United States and Denmark. Subsequent to the passage of that ordinance Congress passed an Act which was approved February 25th, 1927 (ch. 192, 44 Stat. 1234; 8 U.S.C. former § 5b; § 1406), containing (section 1), inter alia, the following:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the following persons and their children born subsequent to January 17, 1917, are hereby declared to be citizens of the United States:

"(a) All former Danish citizens who, on January 17, 1917, resided in the Virgin Islands of the United States, and are now residing in those islands or in the United States or Puerto Rico, and who did not make the declaration required to preserve their Danish citizenship by article 6 of the treaty entered into on August 4, 1916 [prec. 1 V.I.C.], between the United States and Denmark, or who, having made such a declaration have heretofore renounced or may hereafter renounce it by a declaration before a court of record;

"(b) All natives of the Virgin Islands of the United States who, on January 17, 1917, resided in those islands, and are now residing in the Virgin Islands of the United States, and who are not citizens or subjects of any foreign country; and

"(c) All natives of the Virgin Islands of the United States who, on January 17, 1917, resided in the United States, and are now residing in the Virgin Islands of the United States, and who are not citizens or subjects of any foreign country."

Therefore, it will be seen that if the petitioner comes within any of the provisions of the first section of the Act of February 25th, and was an American national at the time of the passage of that Act, that is to say, a citizen of the Virgin Islands entitled to the protection of the United States; Insular Cases, 182 U.S. 1-391, 21 S. Ct. 743 et seq., 45 L. Ed. 1041-1146; she is now, therefore, a citizen of the United States. As will be seen from an examination of said ordinance (supra), American citizenship is a sine qua non conditio to her admission to the Bar; therefore she filed a motion praying that this question be determined, as any other proceeding would be vain if she did not possess the character of American citizen. Her prayer was granted and a hearing was had on the 16th day of August, 1928, at which testimony was taken, the case argued, and the matter submitted and taken under advisement.

The question is, does she come within the formulae of subsection 1, of section 4, of the Ordinance of March 13, 1919 (supra), and any of those contained in the first section of said Act of Congress approved February 25th, 1927 (supra)? She claims to come under subsection "b" of said Act of Congress. If she comes under any one, irrespective of her claim, it would be sufficient. This question is easily determined from her testimony, outside of other testimony or evidence that happened to be offered in the case.

It appears that she was born in St. Croix on the 8th day of October, 1880, and that her parents were Geraldo Synce and Victorine Michael, and that she was baptized in the Roman Catholic Church at Frederiksted, on the 24th November, 1880; there — it further appears that she had, at her birth, the nationality of her mother, and continued to have that nationality until either her mother changed hers or she became of age to act for herself. It does not appear from the evidence that the nationality of either had been changed by naturalization or any other proceeding prior to the transfer of these islands to the United States. Therefore, it may be assumed that her mother was a Danish subject, as she testified that she was, and that she also was a Danish subject up to the time of the transfer. This will be accepted as a fact. It will be noted, from an examination of her petition and other papers, that she uses the name "Esmeralda Sainz," while an examination of the baptismal certificate will reveal that she was baptized under the name of "Mary E. Synce." These surnames, I think, are idem sonans, and will be so accepted for the purposes of this case, it being understood that the petitioner is the person referred to in said baptismal certificate, which was accepted as a fact. (See pages 2 and 3 of the typewritten testimony). As to her residence in St. Croix, departure therefrom, and circumstances surround-

ing her departure, I quote from pages 3 and 4 of the testimony:

"How long did you live in St. Croix? A. I have lived in St. Croix different times.

"Q. How long did you live there before you left there the first time? A. I was too small to remember those things.

"Q. Where did you go from St. Croix, and with whom? A. To St. Thomas. These are things that I have only heard, as you know, from childhood.

"Q. State to the best of your knowledge? A. When I was a child if I wasn't there I would have to be somewhere else.

"Q. State where was that some where else? A. St. Thomas.

"Q. How long did you stay in St. Thomas? A. I don't know.

"Q. When did you leave St. Thomas to go to Puerto Rico the first time? A. Neither can I say that.

"Q. You were so very small? A. I was so very small.

"Q. You left these islands for Puerto Rico with your mother, I assume? A. Yes.

"Q. And when you were very small, so small that you can scarcely remember? A. I cannot remember.

"Q. Then you lived in Puerto Rico practically your whole life time? A. Well, I have had my whole life time there; I had my domicile there, because I go all over and I always have the intention of returning there. I lived in the United States for years."

It thus appears that she and her mother left the Virgin Islands when she was very small, and that they remained in Puerto Rico, except for trips out now and again, until the death of her mother and until she came here on the *14th July* of the current year. Then, dealing further with the matter of her residence, domicile, and so forth, she stated that she lived at Aguadilla and different places on the island (of Puerto Rico), and that she lived with her mother and brother there, both of whom are now dead, her mother having died in 1921, and that she still lives in Puerto Rico, at Santurce N. 25, Dr. Ferrer Street. When asked if she lived with her mother until her mother died, she answered: "She lived with me" (page 4 of testimony).

162

"Q. You say that from time to time you have gone to other places? A. Yes. Q. When you went to those other places you say you had the intention of returning to Puerto Rico as your home? A. That is my domicile, absolutely. Q. No question about that? A. No question about that." (Ibid.). At page 11 of the testimony the following appears:

"But you have always maintained a house in Puerto Rico? A. Yes.

"Q. What you call your home? A. Yes, my homestead, my home sweet home.

"Q. You own this house do you? A. Yes."

In an affidavit which was filed by her about the time of said petition she recites, inter alia, the following:

"I, Esmeralda Sainz, domiciled in Santurce, in the municipality and judicial district of San Juan, Puerto Rico; residing now at N 25 Dr. Ferrer St., Santurce, Puerto Rico, but now on business of my own office, in St. Thomas, Virgin Islands of the United States, and for the purpose of establishing my United States citizenship . . .".

During the course of the testimony she asked that the papers in the case of herself against Ellen Tanggaard, her married sister, be produced as evidence, for such use as could be made of them in connection with the instant matter. This request was granted and the papers produced and admitted, as per request. An examination of those papers will reveal that she instituted a suit against her sister, by filing a paper with the Reconciling Court in St. Thomas on April 20th, 1917, in which she, amongst other things, made the following statement: "On the 20th day of December last year — 1916 — the undersigned Esmeralda Sainz, who is domiciled in San Juan, Puerto Rico, gave my sister Mrs. Ellen Tanggaard, here, power to mortgage my half share in the property No. 20 Norregade, Kings Quarter, in this town . . .".

The mortgage bond filed in said case commences by stat-

ing, that — "We the undersigned, I, Esmeralda Sainz, of Santurce, Puerto Rico, and I, Ellen Tanggaard, of St. Thomas, . . .". And the power of attorney referred to, above, concludes with the same word, "Written and signed by me at Santurce, Puerto Rico, on the 20th day of December, 1916."

When asked about what her occupation was she said: "A. My occupation is attorney at law." And when asked to what bar has she been admitted, she replied:

"A. I have not been admitted to any bar, but I worked at my profession and made all the money I could make, and I am allowed to do that, under the laws of Puerto Rico.

"Q. So then you have actually had your business located in Puerto Rico? A. Yes.

"Q. Where do you pay your income tax? A. There.

"Q. Your other taxes, of course, likewise? A. Yes, but once I used to pay taxes here.

"Q. On your property here? A. Yes, but it is some years now I have not done so, because I sold it.

"Q. Whenever you had any real property in this jurisdiction you naturally paid the tax here, but personal property tax was paid in Puerto Rico? A. Yes."

(See pages 4 and 5 of testimony).

It is perfectly clear, from the record, petitioner's mother made her home, and was domiciled, in Puerto Rico, while petitioner was yet a small child; and it is equally perfectly clear that the home and domicile of the petitioner was in Puerto Rico, until, at least, she became of age, and it would seem indubitable that that domicile continued up to the very time of the hearing in this instant matter. The record shows that she had and has a half brother and sister here, and it is probably true that she visited the home of the half brother and sister at the time they were living with their father, and that she has been at the house of one or the other, or both, of them, since they set up separate establishments. So far as may be gathered from the record

164

she has only been within the area of these islands twice in the last twenty odd years. The records show that she came here on March 3, 1917, (see the paper of April 20, 1917, filed with the Reconciling Court at St. Thomas, and the testimony, page 5, et seq.), and left here some time in February, 1918, (page 7). It also shows that she was here in 1914, (see bottom of page 7 and page 8), and that her visit was in connection with some property matters. To witness Corneiro: "Q. But she didn't come with any idea of making here her home? A. I don't think the 1917 visit, but the times before. Q. But the time, 1914, when she came here, did she come on some business? A. That was for some business, but prior to that year, she came and felt herself very well at home." (Page 13 of testimony). If her residence, home and domicile were in Puerto Rico, at any time — as they undoubtedly were — when was that residence, home or domicile changed? Is there anything whatsoever in the record that would furnish a scintilla of evidence to show that she has actually changed her residence, home or domicile? It seems to be perfectly clear, from a reading of the testimony and an examination of the papers heretofore referred to, that she was not, — on January 17th, 1917, nor at any time before or since — a resident of St. Thomas, or domiciled at St. Thomas, or had anything resembling a home at St. Thomas. The most that can be gathered from the record is that she, on several occasions, by reason of business necessities, or some other such thing, came to St. Thomas, and stayed at the home of her half brother or sister, and that she had, many years before — some where around 1900 — paid quite an extended visit to the home of the father of the said half brother and sister. In each case she promptly returned to Puerto Rico when her visit or business matters were concluded. When she came here in 1914, May 17th, she only remained for a few months; at that time there was some business transaction going

165

on in which she was involved with her sister, as they owned certain properties jointly and were buying another piece of property, as shown by the said records of the case of herself against her half sister, Mrs. Ellen Tanggaard, identified as Ordinary Case No. 3 - 1917, Sainz v. Tanggaard. In one of the papers in that case her half sister, amongst other things, stated: "Very shortly after the making out of the deed-of-conveyance Plaintiff, who even at that time resided in Puerto Rico, came here on a visit, (by "Plaintiff" meaning petitioner) ; she inspected the property and was quite pleased with the acquisition, but she soon returned to Puerto Rico . . .". (Plea filed October 29, 1917).

That it was the understanding of her half brother that she was here in connection with that business is seen by an examination of his testimony at pages 13 and 14. There can be no real question about the fact that she was here on business, and in no way as a person returning to her old home, or for the establishing of a home, residence or domicile. As to her next trip here, in 1917, her own statements made in said paper filed in the Reconciling Court, over her own signature, ought to be conclusive, that statement being as follows: "I came however here — St. Thomas — on the 3rd day of March, to see for myself, how the property was, and how the repairs were going on, and I asked my sister Mrs. Tanggaard to get an account of the money spent." (See paper of April 20, 1917, and filed as complaint to the Reconciling Court, which had to be filed as a basis of all actions going to the District Court). The case was going on from that time, namely, April 20th, 1917, when she filed her first paper in the Reconciling Court, until the judgment was rendered, some time in January. The occasion for her visit in 1917 would be further shown by a reference to the testimony, at page 7. Her half brother, Corneiro, likewise admitted that business was the occasion of her trip

in 1917. (See testimony page 14). Therefore, it is manifest that she could not have effected a change of domicile by either one of these two visits, namely, in 1917 or 1914. There is nothing in the evidence to show how she expected a change of domicile to be effected. There is absolutely nothing in the evidence from which one could conclude that she ever had, or pretended to have, a domicile in the Virgin Islands since a short time after her birth; on the contrary, everything goes to show that she was domiciled in Puerto Rico; she was educated there, never having gone to school in these islands, and is better grounded in Spanish than in English, and this she admitted in her answer to one of the pleas of her sister, in the said lawsuit, as follows: "Very amusing is the reason given, however, that defendant did not know what I wanted. Now, I willingly admit that I make many mistakes when I write in the English language, and that I do not write classical as defendant does . . .". (See paper filed September 7th, 1917).

■-■ The facts show that she has her permanent home in Puerto Rico — the place to which she always expects to return when she leaves, and to which she has always returned when she has been any where, even for some length of time, as in the United States. To use her own words, it is her "homestead and sweet home" — the place to which she always returns whenever she goes away, and expects to return to when she goes away; the place where she has carried on, and always carries on, her business; it is the place where she pays her personal and income taxes; it is the only place in which she has a house in the way of a residence, the word being used in the ordinary sense of the term; it is, in all probability, the place where she would vote, if she actually did vote. She admits that she has voted in the United States, and, if she were qualified to vote in the United States, she would not be qualified to vote in this jurisdiction. Therefore, it appears that every element that

167

would go to show residence, in the technical sense of the term, or in the sense of domicile, is present here, and go to show that her residence, home and domicile, if there be any distinction between those words as used in the said ordinance of March 13th (supra), are in Puerto Rico, and not in the Virgin Islands. Practically, if not literally, the same words are used in the said Act of February 25th (supra) as are used in the said ordinance of March 13th. It is my opinion that the word "residing" is to have the same meaning in both the ordinance and the act of Congress. This question was considered rather exhaustively in the matter of the Petition of Charles Stanley Mayhew, for naturalization, Christiansted Sub-Judicial District, No. 1 - 1927; The matter of the Petition of Arthur O. Boreham, for naturalization, St. Thomas and St. John Sub-Judicial District, No. 14 - 1927. The matter of the petition of William T. Miller, for naturalization, St. Thomas and St. John Sub-Judicial District, No. 6 - 1927. It was there held that the word "residing" meant a legal residence, and not simply a temporary abode. At page 538 of 9 R.C.L. it is said, that —"In a sense domicil is synonymous with home, or residence, or the house of usual abode'." It there further states, that — "The term 'domicil' in its ordinary acceptation means a place where a person lives or has his home. In a strict legal sense that is properly the domicil of a person where he has his true, fixed, permanent home and principal establishment, and to which place he has, whenever he is absent, the intention of returning." And at page 540 it is said, that — " 'Residence', however, as a legal term, is something more than the mere actual presence in a locality, even where it is not equivalent to domicil. For example, a mere temporary absence of a few weeks will not constitute a person a nonresident, if at the time of departure there was an intention of returning at the expiration of that period; nor will his mere presence in a place unaccompanied with any

intention to remain there for any length of time constitute a residence."

As said in the Mayhew case, supra: "Unfortunately these two words are carelessly used as being interchangeable, and therefore, synonymous. Such is not the case. The indiscriminate use of these two words has given rise, on many occasions, to a good deal of controversy. Consequently when they appear in a statute their significance must be first ascertained before the main question can be determined. I apprehend that the intention of the statute in question was to give the word 'residing' the significance of 'domicil'. It is used in a non-technical sense, and is to be read the same as if the word was 'domicil,' that is to say, it is to be considered as synonymous with 'domicil', for the purposes of the act. (meaning the act of February 25th [supra])."

It is, of course, likewise necessary to determine in this matter the meaning to be given to the word "residing". I cannot see that any different meaning should be given in this case to the word "residing" from that given in those naturalization cases. "Residence" or "residing" is to be given the same meaning as "domicile", at least it is to have most of the characteristics that go to make up domicile.

"In general terms, one may be designated as an inhabitant of that place which constitutes the principal seat of his residence, of his business pursuits, connections, attachments, and of his political and municipal relations, . . . Where his family lives is prima facie a man's domicil . . . the place of a man's dwelling house is regarded as his domicil, in contradistinction to any place of business, trade or occupation . . . Of course, long continued habitation is an important circumstance in determining the question of domicil, in the absence of other evidence showing the avowed intention; but no definite period of time is necessary to create a domicil, unless the

169

law so provides . . . The habitation need not be continuous or uninterrupted, for temporary absences do not affect the domicil." (9 R.C.L. 540-541).

■ - ■ Every element mentioned in this quotation is present in the instant case. It would seem definitely to fix her domicile in Puerto Rico. "Sometimes the intention of the person has been definitely expressed and can be proved by his written or spoken declarations. In other cases the conduct has been such as to show the intention. In general, all the circumstances of the particular case should be taken into consideration in determining the person's intention. However migratory the habitation may be, and however difficult on that account may be the proof of the intent to remain, yet if proved, residence combined with intention to remain will constitute domicil. But intent alone, without actual residence, cannot determine the domicil; and, conversely, a domicil once established cannot be given up by merely intending to do so, and without actual removal. Therefore one who has resided and carried on business for years in one jurisdiction cannot for his own purposes insist that his domicil is in another. The facts may belie the expressed intent to retain a domicil actually given up." 9 R. C. L. 543.

■ If the petitioner lost her residence or domicile when she was a small child she must have done something to change it back to this jurisdiction. "To effect such a change, naturalization in the country he adopts as his domicil is not essential. But there must be a voluntary change of residence; the residence at the place chosen for the domicil must be actual; and to the fact of residence there must be added the animus manendi. The mere relinquishment of actual residence is no abandonment of domicil, if there is no intention to change it; as where a man leaves his home for temporary purposes, as for a voyage, for foreign travel, for

health or pleasure, or business of a temporary nature. In all such cases there is animus revertendi." 9 R.C.L. 553.

As a matter of fact petitioner's visits here were solely on business, and there was not even a temporary residence here, in any real sense of that term. She was simply remaining here long enough to transact the matter of business, or conduct the lawsuit, and left as soon as it was concluded.

■■■■ "In actions involving the question as to domicil it is evident that the general rules of evidence apply. When one has changed his place of abode, and the question arises whether he intended to change his domicil, all his acts and conduct which fairly indicate his purpose in that particular within a reasonable time before and after the event may be put in evidence. This is evidence of his intention, and as such is competent, although it may not be part of the res gestae. Accordingly, on the question as to the establishment or abandonment of domicil, it is proper to introduce proof as to the payment of taxes in one jurisdiction rather than in another, and to show the exercise of the right of suffrage in a certain jurisdiction, and generally to prove the declarations as to domicil, made by the party whose domicil is in controversy. Evidence as to the intention in making a home or as to the place of domicil or as to the purpose in leaving a place is admissible. And so abandonment of domicil as a matter of fact may be established by evidence that one left the state of his birth at an early age, returned only once on a visit, and for many years up to his death resided and carried on business in a foreign country. From such facts the intention may very properly be implied." 9 R.C.L. 556, 557. And, "Domicil is presumed, prima facie, to be at that place where the party is shown to be, or where he is resident. This presumption controls unless rebutted by evidence determining his domicil in some other place at that time. It follows that the burden of

171

proof is on the party who claims that the domicil is changed. Continuous residence for a long period of time in a given locality raises the presumption that there was the intent to remain and become domiciled there." 9 R.C.L. 557.

 In Re An Alien, Case No. 201a, Fed. Cas., Judge Betts held, that — "Residence, in its legal acceptation, is the place of a party's home or domicile, and not merely the spot occupied by him for the time being. This may be constantly varying; but every change of abode is not regarded as constituting a new residence, without the accompaniment of an intention to abandon the former for the purpose of taking up another."

That such an understanding in the construction of naturalization law is still the case is shown by a reference to United States v. Shanahan, 232 Fed. 169; United States v. Mulvey, C.C.A., 232 Fed. 513; In re Reichenberg, 238 Fed. 859. And for a general discussion of the term "resided," as used in the naturalization laws, see page 968 et seq. of 6 Fed. Stat. Ann. Such a construction coincides with the meaning given that word by the petitioner, as witness the following (to be found at page 11 of her testimony) :

"Q. If you are residing in Puerto Rico, and have your domicile there, how do you claim to be a resident of St. Thomas? How can you claim residence in two places? I don't mean in the sense that you might have lived here as a visitor. How do you claim a home in St. Thomas, or residence here, in the technical sense of that term? A. Wherever one has a residence it is supposed that that person is living always at that residence, and you cannot suppose nobody to be living any where else but at his residence."

That definition is in accordance with the one given in the naturalization cases of Mayhew, Boreham, and Miller, supra, and with the cases just cited.

 Applying the principles of the law above quoted, as well as her own understanding of the law on this subject, to the facts, as above set forth, it would not seem

that she has the slightest claim to the Virgin Islands as a residence, home or domicile. Therefore, I hold that she is not now, was not on January 17th, 1917, or for many years prior thereto, domiciled or resident anywhere within this jurisdiction, and, therefore, she is not qualified to be admitted as a member of this Bar, under the provisions of section 4 of the said Ordinance of March 13th, 1919 (supra). Her petition is, therefore, denied.

Petition denied.